### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BECKLEY DIVISION

**MARY SELENA BERRY,**

      **Plaintiff,**

**v.**                             **Case No.: 5:16-cv-01500**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the**
**Social Security Administration,**

      **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable Irene C. Berger, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 9, 10).

The undersigned has thoroughly considered the evidence and the applicable law. For the following reasons, the undersigned **RECOMMENDS** that the final decision of the Commissioner be **REVERSED;** this matter be **REMANDED** for further proceedings

pursuant to sentence four of 42 U.S.C. § 405(g); and this action be **DISMISSED, with prejudice,** and removed from the docket of the Court.

## I.   <u>Procedural History</u>

On February 25, 2013, Plaintiff, Mary Selena Berry ("Claimant"), completed an application for DIB, alleging a disability onset date of January 31, 2013, due to "Lupus, arthritis, disc degeration (*sic*), and depression, back disc degeneration, fibromyalgia, [and] Polyneuropathy." (Tr. at 207, 230). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 142, 150). Claimant filed a request for an administrative hearing, which was held on October 7, 2014, before the Honorable John T. Molleur, Administrative Law Judge ("ALJ"). (Tr. at 84-116). By written decision dated October 17, 2014, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 68-79). The ALJ's decision became the final decision of the Commissioner on January 4, 2016, when the Appeals Council denied Claimant's request for review. (Tr. 1-4).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 1). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 5, 6). Both parties filed memoranda in support of judgment on the pleadings, (ECF Nos. 9, 10); consequently, the issues are fully briefed and ready for resolution.

## II.   <u>Claimant's Background</u>

Claimant was 58 years old at the time she filed the instant application for benefits, and 59 years old on the date of the ALJ's decision. (Tr. at 68). She has a high school education and communicates in English. (Tr. at 229, 231). Claimant's past relevant work includes a longstanding position as a proof operator/new accounts at a bank. (Tr. at 231).

### III.   Summary of ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and

final step in the process, that the claimant is able to perform other forms of substantial gainful activity when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through September 30, 2018. (Tr. at 70, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since January 31, 2013, the alleged onset of disability. (*Id.,* Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "inflammatory disease/systemic lupus erythematosus; obesity; degenerative joint disease of the bilateral knees status-post total right knee replacement; osteoarthritis; major depressive disorder; and panic disorder." (Tr. at 70-71, Finding No. 3). The ALJ also considered Claimant's recent wrist fracture, which was sustained one month prior to the decision, but found that it was too early to tell whether Claimant would have associated residual limitations lasting more than twelve months; thus, the ALJ found that Claimant's left wrist fracture status-post surgery was non-severe. (Tr. at 71, Finding No. 3).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 71-74, Finding No. 4). Accordingly, the ALJ determined

that Claimant possessed:

> [T]he residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she can never climb ladders, ropes, or scaffolds. She can perform all other postural activities occasionally. The claimant can occasionally forcefully grip and twist with both hands. She can have no exposure to extreme cold. She is limited to brief, incidental contact with members of the general public.

(Tr. at 74-78, Finding No. 5). At the fourth step, with the assistance of a vocational expert ("VE"), the ALJ determined that Claimant was able to perform her past relevant work as a proof operator. (Tr. at 78-79, Finding No. 6). Therefore, the ALJ found that Claimant was not disabled as defined in the Social Security Act, and was not entitled to benefits. (Tr. at 79, Finding No. 7).

## IV.   Claimant's Challenge to the Commissioner's Decision

Claimant asserts three challenges to the Commissioner's decision. First, she argues that the ALJ erred by failing to "include limitations to account for [Claimant's] systemic lupus erythematous, which the ALJ found to be severe." (ECF No. 9 at 9). Although Claimant does not identify the limitations that allegedly should have been included in the RFC finding, she focuses her argument on the manipulative limitations identified by the ALJ. According to Claimant, the ALJ failed to conduct a proper assessment of the effects of lupus and inflammatory arthritis on Claimant's ability to handle and finger and failed to explain why additional limitations were unnecessary. (ECF No. 9 at 9-15). In her second challenge, Claimant contends that the ALJ failed to elicit a reasonable explanation from the vocational expert ("VE") regarding testimony that appeared to conflict with the Dictionary of Occupational Titles ("DOT"). According to Claimant, Social Security Ruling ("SSR") 00-4p required the ALJ to resolve such conflicts before relying on the VE's testimony. (*Id.* at 16). Finally, in her third challenge, Claimant argues that the ALJ failed

to evaluate the severity of her fibromyalgia at step two, or at any subsequent steps of the sequential evaluation. (*Id.* at 18).

In response to Claimant's arguments, the Commissioner states that the substantial evidence standard of review is highly deferential to the Commissioner's decision and, in this case, the objective medical evidence, opinion evidence, and Claimant's activities of daily living substantially support the ALJ's evaluation of Claimant's RFC. (ECF No. 10 at 9-12). Regarding lupus, the Commissioner contends that the ALJ thoroughly discussed the medical evidence and Claimant's alleged manipulative impairments. (*Id.* at 12-13). The Commissioner further argues that the ALJ was entitled to rely on the VE's testimony and that substantial evidence supports the ALJ's evaluation of her fibromyalgia. (*Id.* at 13-20).

## V.   **Relevant Medical History**

While the undersigned has reviewed all evidence of record, only the medical information most relevant to the disputed issues is summarized below:

### A.   *Treatment Records*

On March 20, 2012, Claimant presented to rheumatologist, Wassim Saikali, M.D., for follow-up regarding osteoarthritis, history of fibromyalgia, and a positive antinuclear antibody (ANA) lab result, suggesting the presence of an autoimmune disorder. (Tr. at 326-27). Claimant reported pain in the right shoulder that was not related to exertion. (Tr. at 326). Upon examination, Claimant had positive right shoulder impingement and degenerative hypertrophy and crepitus in both knees. (*Id.*). In addition, degenerative nodules were noted in Claimant's second and third distal interphalangeal (DIP) and proximal interphalangeal (PIP) joints of Claimant's hand. Claimant was given a kenalog and lidocaine injection for bursitis in her shoulder. (*Id.*).

Claimant returned to Dr. Saikali on April 17, 2012 with complaints of mild pain and stiffness in her muscles, neck, shoulders, and arm. (Tr. at 328). Dr. Saikali again noted degenerative nodules in the second and third DIP and PIP joints, as well as tenderness in the trapezia/nuchal (posterior neck and upper back) area. (*Id.*).

On June 25, 2012, Claimant presented to Dr. Saikali with complaints of generalized aches and pains in several joints of her hands and knees. (Tr. at 329). The degenerative nodules appreciated in prior visits had not changed, and Claimant still had mild tenderness in the trapezia/nuchal area. (*Id.*). Dr. Saikali felt that Claimant's most pressing issue was osteoarthritis, but he also assessed her with fibromyalgia. (*Id.*). To treat the fibromyalgia, Claimant was advised to continue her medication and to increase exercise. Her laboratory results for rheumatoid arthritis measured within the normal range. (Tr. at 341). However, her ANA lab results were abnormal, and her anti-double stranded DNA result for lupus measured high positive. (Tr. at 342). Based upon the laboratory results and Claimant's history of inflammatory arthritis, Dr. Saikali opined that Claimant most likely had lupus in addition to osteoarthritis and fibromyalgia. (Tr. at 330). The plan was to continue Claimant's prescription of Plaquenil. (*Id.*).

During a follow-up appointment on August 20, 2012 with Surgical Care of West Virginia regarding diverticulosis and other issues, Claimant's musculoskeletal examination revealed normal motor strength and tone without contractures, malalignment, tenderness, or bony abnormalities. (Tr. at 441-43). Her extremities were negative for cyanosis, edema, or vancosities. *(Id.).* Claimant's deep tendon reflexes and coordination were normal. (*Id.*). Inspection of her skin showed no rash, lesions, induration, nodules, jaundice or abnormal nevi. (*Id.*).

Claimant returned to Dr. Saikali one week later on August 27. (Tr. at 331). She reported that her "main problem" was knee pain. (*Id.*). She described the pain as moderate to severe, worse with ambulation and at the end of the day, and associated with stiffness. Claimant was assessed with stable fibromyalgia, osteoarthritis of the feet, possible lupus based on testing, and arthralgias. (*Id.*). She was advised to continue her medication regimen of Plaquenil, Celebrex, and Tylenol 3, and to return for reevaluation in three months or sooner if needed. (*Id.*).

On October 25, 2012, Claimant saw Dr. Saikali for foot pain and pain and discomfort in her hands associated with stiffness and soreness, but no numbness. (Tr. at 332). She stated that her symptoms were "relieved some by Celebrex." (*Id.*). She also had generalized aches and pains in her neck, shoulders, and arm that were worse over the previous few weeks, but were relieved some by Topomax and Tylenol 3. (*Id.*). On examination, Claimant had decreased flexion of the lumbar spine, degenerative hypertrophy of both knees, and tenderness in her trapezia/nuchal area. (*Id.*). Dr. Saikali diagnosed Claimant with probable lupus treated by Plaquenil, stable fibromyalgia treated by Cymbalta and Tomopax, and stable osteoarthritis treated by Celebrex and Tylenol 3. (*Id.*).

Two months later, on December 18, 2012, Claimant saw Dr. Saikali for increased back and hip pain associated with stiffness and soreness that was radiating to her lower extremity. (Tr. at 334). The pain was worse in the morning and was dull and achy in nature. Claimant had no swelling in her metacarpophalangeal (MCP) or PIP joints, but had minimal degenerative nodules in the second and third DIP and PIP joints. (*Id.*). She had mild tenderness over the greater trochanteric area and tenderness in the trapezia/nuchal area. (*Id.*). Dr. Saikali diagnosed Claimant with lumbar spondylosis and

mild osteoarthritis in her back and pelvis, which was treated by Tylenol 3. With respect to her lupus, Claimant was to continue Plaquenil and return for reevaluation in three months. (*Id.*). Claimant was instructed to lose weight and go to physical therapy. (*Id.*).

On February 7, 2013, during a follow-up appointment with Dr. Saikali, Claimant's main complaint was bilateral hand pain, which was worse in her right hand and was associated with stiffness, soreness, and numbness, especially early in the morning. (Tr. at 335). Claimant's Phalen's test was positive on the right side. (Tr. at 336). Dr. Saikali felt that Claimant's symptoms were due to carpel tunnel syndrome, which had been diagnosed several years earlier. (*Id.*). He administered a kenalog and lidocaine injection to her right hand. (*Id.*). Dr. Saikali advised Claimant that if she continued to have numbness in her right hand, he would refer her for surgery. (*Id.*). She was instructed to return in two to three months, unless she needed an injection in her left hand before the next appointment. (*Id.*). During a cardiac appointment later that month, Claimant reported muscle aches and arthralgias/joint pain, but she did not have joint tenderness or swelling in any of her extremities. (Tr. at 363-64).

On April 10, 2013, Claimant followed-up with Ruth Rhodes, Certified Physician's Assistant ("PA-C"), regarding lupus, osteoporosis, and fibromyalgia. (Tr. at 322). Claimant reported that she was generally doing well in terms of lupus and was tolerating Plaquenil well. (*Id.*). Her biggest complaint was bilateral leg pain. Claimant denied back pain, but reported having left hip pain if she laid on her left side at night. She also had mild arthralgias of her hands and hips that was "dull" and "achy;" however, she took Celebrex twice per day, which helped, as well as Tylenol 3 as needed. (*Id.*). On examination, there were no "hot, swollen" joints in her hands. (*Id.*). She had tenderness to palpation of the left greater trochanter area, but no deformity or swelling. (*Id.*).

9

Claimant was assessed with left greater trochanteric bursitis, for which she was given a lidocaine injection; fibromyalgia; lupus; osteoarthritis; and restless leg syndrome. (*Id.*). She was instructed to continue taking Celebrex, Plaquenil, and Tylenol 3 and to return to the clinic in two months or sooner, if needed. (*Id.*).

On June 11, 2013, Claimant again saw Dr. Saikali for follow-up regarding her osteoarthritis and fibromyalgia. (Tr. at 323). Claimant reported that she had mild to moderate generalized aches and pains for the past few weeks that were gradually becoming worse. (*Id.*). She described the pain as dull and achy with associated stiffness and soreness; it was worse in the morning and at the end of the day. (*Id.*). On examination, Claimant had a decreased range of motion in the second and third DIP joints in her hand and tenderness in the trapezia/nuchal area, lateral epicondyle, and greater trochanteric area. (Tr. at 324). Dr. Saikali diagnosed Claimant with fibromyalgia. (*Id.*). Dr. Saikali added that while Claimant had a history of probable lupus based on photosensitivity, double-stranded DNA, and positive ANA, most of her symptoms were related to fibromyalgia and osteoarthritis. (*Id.*). Dr. Saikali wanted to repeat Claimant's blood test and lupus serology, but Claimant refused, stating that she would provide a copy of her recent blood test from her primary care provider. (*Id.*). Dr. Saikali recommended exercise and weight loss to reduce her fibromyalgia symptoms. (*Id.*). He prescribed Neurontin for pain, but was reluctant to increase Claimant's Lortab and declined to prescribe Tylenol 3. (*Id.*).

On July 3, 2013, Claimant saw Ms. Rhodes and reported that she was still doing well as far as her lupus and was tolerating Plaquenil. (Tr. at 581). Claimant also stated that Neurontin, which she began on her previous visit, was helping her fibromyalgia pain; however, she was considering discontinuing it because it caused extreme edema in her

feet. (*Id.*). Claimant described the pain from fibromyalgia as a dull, burning sensation that increased with activity and in humid weather. She stated that the pain was worse in her neck, low back, and hip area. (*Id.*). She also complained of mild arthralgias of her hands that were improved with Celebrex. (*Id.*). On examination, Claimant had tenderness to palpation of the left greater trochanter area, but no deformity or swelling, and no evidence of hot, swollen joints in her hands. (*Id.*).

The next month, on August 12, 2013, Claimant followed-up with Ms. Rhodes for complaints of lupus, fibromyalgia, osteoarthritis, and restless leg syndrome. Claimant continued to have mild arthralgias in her hands, which were not improved by Tylenol 3 and Celebrex. (Tr. at 582). She had increased pain and intermitted swelling in her right third finger with no known injury. (*Id.*). Claimant described the pain as dull and achy and it increased in rainy weather. (*Id.*). On examination, Claimant's hands did not appear to have hot, swollen joints, but there were degenerative changes over her right third PIP and MCP joints. (*Id.*). Claimant had tenderness to palpation of the nuchal area, trapezius muscles, and lumbar paraspinal muscles bilaterally. (*Id.*). At a follow-up visit in September 2013, Ms. Rhodes documented that Claimant had knee pain and flank pain, but otherwise had no complaints related to her hands, neck, shoulders, or back. Her hands showed no evidence of hot, swollen joints, and she had a full range of motion in her upper extremities and left knee. (Tr. at 584). Her right knee had mild medial and lateral effusion, and Claimant was unable to flex her right knee beyond 30 degrees without pain. (*Id.*). She was scheduled for a right knee MRI.

On October 3, 2013, Claimant saw Dr. Saikali for continued complaints of pain, swelling, and stiffness in multiple joints in her hands and wrists. (Tr. at 559). Claimant stated that the pain was relieved some with Tylenol 3. (*Id.*). She had tenderness in the

trapezia/nuchal area. (Tr. at 560). On examination, Dr. Saikali did not observe a rash or much swelling; therefore, he continued Plaquenil and Celebrex. Dr. Saikali also started Claimant on Methotrexate for inflammatory arthritis. He instructed her to return for reassessment after her upcoming knee replacement. (*Id.*).

On December 5, 2013, Claimant saw Ms. Rhodes complaining of ongoing severe pain in her right knee, dull pain in her left knee, and arthralgias of her hands, hips, and feet. (Tr. at 562). She also continued to have fibromyalgia pain over her neck and low back, which had worsened due to increased stress and cold weather. (*Id.*). Claimant advised that she was scheduled for knee surgery the following week and was anxious about the procedure. On examination, Claimant had a full range of motion of the upper extremities, without evidence of hot, swollen joints in her hands. (*Id.*). Her left knee had a full range of motion, but her right knee was limited. Ms. Rhodes assessed Claimant with fibromyalgia, lupus, osteoarthritis, restless leg syndrome, and left knee osteoarthritis. She was instructed to continue her medications and to lose weight. (*Id.*).

On March 11, 2014, Claimant saw Dr. Saikali in follow-up. She complained of mild discomfort in her right knee after knee replacement surgery, and pain related to a newly-discovered leg length discrepancy. Claimant continued to have mild dull and achy pain, stiffness, and soreness in her neck, shoulder, and back. (Tr. at 563). However, she had no new symptoms related to lupus and felt that Plaquenil helped with that condition. (Tr. at 563-64). On examination, Claimant had a decreased range of motion in the second and third DIP and degenerative hypertrophy of the left knee. (Tr. at 564). Dr. Saikali instructed Claimant to continue taking her medication, and to speak with her podiatrist about a shoe insert. Dr. Saikali felt that some of Claimant's hip and back pain was related to her leg length discrepancy.

Two months later, on May 8, 2014, Claimant returned to Dr. Saikali's office. (Tr. at 602). Claimant continued to complain of minimal pain in her hand, knees, neck, and back, which was dull and achy, but was relieved some by Tylenol 3. (Tr. at 602). On examination, Claimant did not have tenderness or swelling in any of her joints or spine. (Tr. at 603). Dr. Saikali assessed Claimant's lupus as clinically quiescent. (*Id.*). Later that month, Claimant saw internal medicine specialist and nephrologist, Divya Rajan, M.D. (Tr. at 605). He noted that Claimant's lupus was in remission, but she had fibromyalgia and psychological issues. (*Id.*). On examination, Claimant had a normal range of motion of the upper and lower extremities, but had limited range of motion of the rest of her musculoskeletal system due to chronic back and leg pain. (Tr. at 606). Dr. Rajan diagnosed Claimant with chronic kidney disease, stage 3; lupus; and primary fibromyalgia syndrome. (*Id.*). Dr. Rajan noted that Claimant had a relatively new onset of renal failure, the cause of which Dr. Rajan could not pinpoint. However, he added that Claimant "certainly had a lot of reasons for kidney involvement," including her history of Celebrex use and lupus. (*Id.*). He instructed her to stop taking non-steroidal anti-inflammatory medications to see if that relieved the problem. She was told to return in thirty days.

On July 14, 2014, Claimant saw Dr. Saikali and complained of generalized aches and pains in multiple areas associated with stiffness and soreness; pain in the back and knees; and swelling and stiffness of her hands in the morning that was helped by Celebrex. (Tr. at 610). On examination, Claimant had a decreased range of motion in the second and third DIP and tenderness in the trapezia/nuchal area. (Tr. at 611). Dr. Saikali believed Claimant's lupus was still quiescent, but he was concerned that lupus was causing her kidney issues. (*Id.*). Dr. Saikali indicated that Claimant needed to discontinue Celebrex because of its potential effect on her kidney functioning. (*Id.*). She was instructed to

continue taking Plaquenil and to restart Tylenol 3 to replace Celebrex. (*Id.*).

On July 21, 2014, Claimant reported to Dr. Rajan that the lack of Celebrex was causing her a lot of pain all over. (Tr. at 615). Dr. Rajan reviewed Claimant's laboratory results and determined that her long-term use of Celebrex, not lupus, was the likely cause of her renal insufficiency, although not the sole cause. (Tr. at 616-17). Dr. Rajan decided that Claimant could re-start Celebrex at a half dose, as she reported not doing well without it, and he would follow her renal function closely to manage the risks/benefits. (Tr. at 617). She was told to increase water intake and return in thirty days.

On August 20, 2014, Claimant again saw Dr. Rajan.  (Tr. at 618). She reported "doing ok," although she was having a great deal of arthritic pain. Claimant's renal function had improved, so Dr. Rajan allowed Claimant to increase her Celebrex dosage. (Tr. at 619). He planned to watch her renal function closely.

On September 15, 2014, Claimant saw Dr. Saikali in follow-up. She reported continued diffuse generalized aches and pains in multiple areas, including her hands and shoulder, that were not relieved by Tylenol 3 and a half-dose of Celebrex. (Tr. at 673). She also stated that her podiatrist had x-rayed her right knee and ankle. He found Claimant's knee replacement to be fine, but advised that her right ankle did not look good. On examination, Claimant had decreased range of motion in her second and third DIP and tenderness in her trapezia, nuchal area, lateral epicondyle, and greater trochanteric area. (Tr. at 674). Dr. Saikali felt that Claimant's lupus was stable, and she was told to continue taking Plaquenil. To treat her fibromyalgia, she was advised to increase activity and perform stretching exercises. (*Id.*). She was to continue taking her partial dose of Celebrex for pain related to osteoarthritis. (*Id.*).

The following month, on September 19, 2014, Claimant presented to Raleigh General Hospital after falling off a stepladder. Claimant was diagnosed with left wrist and ninth rib fractures and was admitted for orthopedic care. (Tr. at 645, 647, 650). Claimant's wrist fracture was treated surgically, and she was discharged in stable condition two days later. (Tr. at 651, 668).

### B. Evaluations and Opinions

On May 16, 2013, Irene M. Wasylyk, M.D., examined Claimant for the purpose of her DIB claim. (Tr. at 308-13). Claimant reported that her symptoms were persistent, but had decreased. (Tr. at 308). She said her legs were especially painful, and she had low back pain that was a constant 6 to 7 on a 10-point pain scale. (*Id.*). Claimant complained of joint swelling in her right hand and generalized myalgias in her shoulders and hips. (Tr. at 309). On examination, Claimant had preserved grip strength and manipulation and her sensation was intact in her upper extremities. (Tr. at 310). She had point tenderness to palpation of her bilateral trochanteric bursa. (*Id.*). Dr. Wasylyk noted Claimant's "recent diagnosis of lupus with intermittent description of joint synovitis and morning stiffness." (Tr. at 310). She also noted, *inter alia*, Claimant's history of polyneuropathy with daily lower extremity pain, low back pain with negative straight leg-raising test, reduced range of motion in her shoulder and hip, bilateral hip pain, mildly reduced range of motion of her cervical spine, and osteoarthritis. (*Id.*).

On May 31, 2013, after reviewing Claimant's medical records, Amy Wirts, M.D., opined that Claimant had the RFC to perform light work with additional postural and environmental limitations. (Tr. at 124-26). Dr. Wirts found that Claimant's statements were mostly credible. Dr. Wirts noted that although Claimant had degenerative nodules in the second and third DIP and PIPs, she did not have any manipulative limitations. (Tr.

at 125-26). Dr. Wirts further opined that Claimant could perform her past relevant work as a proof operator as she actually performed the job duties; therefore, Claimant was not disabled with the meaning of the Social Security Act. (Tr. at 126-27). On September 23, 2013, Rogelio Lim, M.D., reviewed Claimant's records at the reconsideration level of her claim and affirmed Dr. Wirts's findings. (Tr. at 137-140).

Dr. Saikali provided a letter to the SSA dated October 11, 2013 regarding Claimant's condition. (Tr. at 561). Dr. Saikali indicated that Claimant had recent complaints of severe arthritis pain in her knee. An MRI study showed advanced osteoarthritis and a suspected tear, which required surgical correction. In addition, Claimant continued to suffer from generalized aches and pains in multiple joints secondary to fibromyalgia. (*Id.*). She also had inflammatory arthritis positive double stranded DNA and ANA, which caused continuous discomfort and swelling in the joints, hands, wrists, elbows, and knees and would require treatment with a chemotherapeutic agent. (*Id.*). Based upon these conditions and symptoms, Dr. Saikali opined that Claimant was unable to engage in gainful employment. (*Id.*).

## VI.  <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)).

When examining the Commissioner's decision, the Court does not conduct a de novo review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001)). Instead, the Court's role is limited to insuring that the ALJ followed applicable regulations and rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.  <u>Discussion</u>

### A.  The ALJ's Finding Regarding Manipulative Limitations

In her first challenge, Claimant states that the ALJ failed to include limitations in the RFC finding to account for her lupus, which the ALJ found to be severe. (ECF No.  9 at 9-15). Specifically, Claimant contends that the ALJ disregarded evidence of pain, swelling, nodules, and diminished range of motion affecting the joints in Claimant's hands. (*Id.*). Claimant acknowledges that the ALJ limited her to only occasional forceful gripping and twisting with both hands, but argues that additional handling and fingering limitations were warranted. (*Id.* at 12-13). Further, she contends that even though her hand pain was intermittent, the ALJ was required to determine if it precluded the performance of substantial gainful activity on a reasonably regular basis. (*Id.* at 13). Having considered the argument and the evidence, the undersigned **FINDS** this challenge to be without merit.

In his written decision, the ALJ addressed Claimant's reports of having "trouble holding on to things and opening things," noting that Claimant focused on her hand pain during the administrative hearing. (Tr. at 75). However, the ALJ found that Claimant's

clinical records did not support the level of functional limitation alleged by Claimant. First, the ALJ pointed out that Claimant had multiple physical examinations conducted by various treaters, and these examinations showed no evidence of swelling, redness, warmth, or effusion of the joints. (*Id.*). Next, the ALJ addressed Dr. Wasylyk's findings from her consultative examination of Claimant. The ALJ remarked that while Dr. Wasylyk found slight limitations in Claimant's ability to flex and extend her wrists and a similar slight reduction in left ulnar deviation, Dr. Wasylyk also documented that Claimant had full radial deviation, bilaterally; full ulnar deviation on the right; and the ability to fully extend both hands, make fists, and oppose all fingers. (*Id.*). Moreover, Claimant's upper extremity strength and grip strength were normal on that examination, as was her fine manipulation. (*Id.*). The ALJ added that Claimant's reports of hand pain were sporadic, and thus, did not pose a constant problem for her. Based on this evidence, the ALJ reasoned that the limitations he included in Claimant's RFC were sufficient to address her manual restrictions. He explained that additional manipulative limitations were not warranted due to the paucity of evidence confirming greater functional deficits. (*Id.*).

As cited above, the ALJ explicitly considered Claimant's treatment records, her statements, and the findings of the consultative examiner in assessing Claimant's manipulative restrictions. The ALJ included limitations in Claimant's RFC to account for the functional result of Claimant's lupus and inflammatory arthritis, to the extent that manipulative deficits were established by the record. Moreover, the ALJ's determination of Claimant's manipulative limitations as described in the RFC finding is supported by substantial evidence. While Claimant's treatment records confirm that she had degenerative nodules and some decreased range of motion in her second and third DIP and PIP joints, her records also universally demonstrate that Claimant's joint pain or

"arthralgias" were mild and the joints in her hands were never hot and swollen. (Tr. at 322, 324, 326, 328, 332, 334, 335, 559, 562, 564, 578, 581-82, 584, 603, 610, 674). Claimant's rheumatologist, Dr. Saikali, stated that Claimant's hand symptoms were "basically carpel tunnel syndrome" that was diagnosed several years earlier. (Tr. at 332, 335, 559). Further, on all but a couple of occasions, Claimant reported that her hand symptoms were improved by Celebrex and Tylenol 3. (Tr. at 559, 562, 578, 581-82, 602, 610, 673). During her consultative examination in May 2013, Claimant had no joint swelling in her right hand, preserved grip strength and manipulation, and her sensation was intact in her upper extremities. (Tr. at 310). The following year, in May and June 2014, Dr. Saikali referred to Claimant's lupus as "clinically quiescent," and her internal medicine specialist, Dr. Rajan, agreed that her lupus was "in remission." (Tr. at 603, 605, 611). Moreover, two state agency physicians reviewed Claimant's records and found that Claimant had no manipulative impairments. (Tr. at 125, 138).

Claimant does not identify any specific limitation that should have been, but was not, included in her RFC. *See, e.g., Nock v. Comm'r, Soc. Sec. Admin.*, No. SAG-14-3986, 2015 WL 5781988, at *3 (D. Md. Sept. 30, 2015) ("Ms. Nock does not support that argument with any medical evidence or even any suggestion of the type of restrictions that, in her view, should have been included in the RFC assessment. Ultimately, there is no requirement that every severe impairment be addressed via a particular limitation in an RFC assessment."). Claimant notes that the vocational expert testified that a limitation to frequent handling and fingering would have precluded Claimant's past work as a proof operator. (ECF No. 9 at 14). However, none of the medical sources opined that Claimant was limited in such a manner. In this case, the ALJ thoroughly reviewed the evidence regarding Claimant's hand symptoms and their associated functional deficits. The ALJ

included limitations in the RFC to account for those deficits. While Claimant may disagree with the ALJ's RFC finding, "the determination of a claimant's RFC is ultimately the province of the ALJ as the representative of the Commissioner." *McPherson v. Astrue*, 605 F. Supp. 2d 744, 755 (S.D. W. Va. 2009) (citing 20 C.F.R. § 404.1527(e)(2); *see also Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir.1990)." "The reviewing court's sole responsibility is to determine whether the ALJ's determination of the claimant's RFC is rational and based on substantial evidence." *Id.* (citing *Oppenheim v. Finch,* 495 F.2d 396, 397 (4th Cir.1974)). As outlined above, the record supports that ALJ's RFC finding.

Furthermore, the undersigned is unpersuaded by Claimant's contention that the ALJ disregarded Claimant's hand pain because it was intermittent. Claimant cites legal authority which provides that "[m]edical impairments causing temporary periods of incapacitation for periods over 12 months qualify as disabling when they preclude performance of substantial gainful activity on a reasonably regular basis." (ECF No. 9 at 13); *Dagenhart v. Colvin*, No. 5:13-CV-76-GCM, 2014 WL 4672429, at *3 (W.D.N.C. Sept. 18, 2014). Therefore, "[w]hen a claimant's impairments present intermittent symptoms, the question is whether the sporadic incapacity prevents her from performing any substantial gainful activity within the meaning of the Social Security Act [and] [t]he ALJ must consider this question and make specific findings on whether [the plaintiff's] intermittent incapacity constitutes an inability to perform any substantial gainful activity." *Id.*

Claimant suggests that because the ALJ noted that her hand pain was sporadic and did not appear to be a constant problem, the ALJ consequently disregarded whether her hand pain caused temporary periods of incapacity which prevented her from performing substantial gainful activity. To the contrary, the ALJ clearly articulated his analysis of the

evidence pertaining to Claimant's alleged hand impairment. The ALJ considered the waxing and waning nature of Claimant's hand symptoms, but concluded that Claimant's deficiencies in gripping and twisting were sufficiently pronounced to require specific limitations in her RFC finding.

### B. The ALJ's Reliance on the VE's Testimony

In her second challenge, Claimant argues that the ALJ failed to resolve a conflict between the VE's opinion and the DOT. (ECF No. 9 at 16). The VE testified that Claimant could perform positions, including her past relevant work as a proof operator, despite her limitation to occasional forceful gripping and twisting with both hands, so long as she could perform the constant handling and fingering that was required of those jobs. Claimant states, however, that the Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles (1993 ed.) ("SCO") does not delineate "forceful gripping and twisting" from handling and fingering motions. (*Id.*). Rather, the SCO defines "handling" as "[s]eizing, holding, grasping, turning, or otherwise working with hand or hands." (*Id.*). Therefore, Claimant argues that this was an apparent conflict for which the ALJ was required to elicit a reasonable explanation prior to relying on the VE's testimony as required by SSR 00-4p. (*Id.*).

Social Security Ruling 00-4p provides the following guidance regarding conflicts in occupational information:

> Occupational evidence provided by a VE or VS generally should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.

21

> Neither the DOT nor the VE or VS evidence automatically "trumps" when there is a conflict. The adjudicator must resolve the conflict by determining if the explanation given by the VE or VS is reasonable and provides a basis for relying on the VE or VS testimony rather than on the DOT information.

Policy Interpretation Ruling: Titles II & Xvi: Use of Vocational Expert & Vocational Specialist Evidence, & Other Reliable Occupational Info. in Disability Decisions, SSR 00-4p (S.S.A. Dec. 4, 2000).

Claimant relies on *Pearson v. Colvin*, 810 F.3d 204 (4th Cir. 2015) to support her positon that the ALJ failed to comply with SSR 00-4p. In *Pearson*, the United States Court of Appeals for the Fourth Circuit examined SSR 00-4p and held that an ALJ must identify apparent conflicts between the VE's testimony and the DOT, must elicit an explanation from the VE for the conflicts, and must determine whether the explanation provides a basis for relying on the VE's testimony. *Pearson*, 810 F. 3d at 209-10. In *Pearson*, the VE testified that a person with the claimant's limitations could perform jobs which, by DOT definition, required frequent reaching. However, as provided in the hypothetical, the claimant could only occasionally reach upward with one of his arms. *Id*. at 206. The ALJ did not identify the apparent conflict between the VE's testimony and the DOT and did not elicit an explanation from the VE for the conflict. As a result, the Fourth Circuit found that the VE's testimony did not constitute substantial evidence in support of the ALJ's decision at step five of the disability determination process. *Id*. at 211.

By contrast, in this matter, the ALJ presented a hypothetical to the VE which limited the claimant to, *inter alia*, occasional forceful gripping and twisting with both hands. (Tr. at 108). The VE first responded that the hypothetical individual could not perform Claimant's past relevant work, including her work as a proof operator, because the work required constant and frequent upper extremity activity. (*Id*.). The ALJ then

22

clarified the hypothetical question for the VE, explaining that the hypothetical individual was only limited with respect to forceful gripping and twisting, not other upper extremity activity. (*Id.*). In light of this clarification, the VE testified that with only those limitations, the individual could perform the work activities of a proof operator. (*Id.*). In the written decision, the ALJ confirmed the VE's testimony that Claimant's past work as a proof operator required constant reaching and handling and occasional fingering and that the ALJ asked the VE whether an individual with Claimant's RFC, which limited her to occasional forceful gripping and twisting, could perform such work. (Tr. at 78-79). The ALJ cited the VE's testimony that the individual could perform the job; therefore, the ALJ stated that he "accepts this testimony and finds accordingly." (*Id.*).

The ALJ clearly complied with SSR 00-4p and the Fourth Circuit's holding in *Pearson*. The ALJ identified the apparent conflict between the upper extremity requirements of the proof operator position and Claimant's limitation to occasional forceful gripping and twisting with her upper extremities. He then resolved the conflict by clarifying the hypothetical and allowing the VE to provide an explanation. Indeed, the VE initially responded that an individual who was limited to less than constant or frequent use of her upper extremities could not perform the work activities of that job. However, after the ALJ explained that he did not intend the hypothetical individual to be generally limited in the use of her upper extremities, but only in the ability to grip and twist, the VE responded that such a person could work as a proof operator.

The Fourth Circuit was clear that "in many cases, testimony may only appear to conflict with the [DOT], and the vocational expert may be able to explain that, in fact, no conflict exists." *Pearson*, 810 F.3d at 209. In this case, the subsequent clarification of the hypothetical question, followed by the VE's testimony, resolved the original conflict.

Although the DOT does not delineate between the upper extremity activities of gripping/twisting and handling/fingering, the VE's testimony makes clear that the specific job of proof operator requires different frequencies of those activities. (Tr. at 108). Specifically, the VE affirmatively confirmed that the job does not require more than occasional gripping and twisting, although it requires constant handling and fingering. That testimony does not conflict with the DOT; instead, the testimony supplements the DOT. Therefore, the undersigned **FINDS** that the VE's testimony provided substantial evidence for the ALJ's finding that Claimant could perform her past relevant work as a proof operator.

### C.  The ALJ's Lack of Analysis of Claimant's Fibromyalgia

In her third challenge, Claimant argues that the ALJ failed to evaluate the severity of her fibromyalgia at step two or any subsequent steps of the sequential evaluation. (ECF No. 9 at 18). The undersigned agrees with this assertion. The ALJ's decision does not discuss Claimant's fibromyalgia whatsoever other than to state that Claimant "has fibromyalgia." (Tr. at 75). Claimant asserted in her initial application for DIB that fibromyalgia and other conditions prevented her from engaging in substantial gainful activity. She had a medical diagnosis of fibromyalgia and was treated for years by a rheumatologist. Claimant's diagnosis of and treatment for fibromyalgia extended throughout the relevant period. Her medical records contain numerous references to pain and tenderness related to fibromyalgia, and that condition was considered to be the source of many of Claimant's complaints. Yet, despite this evidence, the ALJ did not address Claimant's medically determinable impairment of fibromyalgia, did not assess the severity of the condition, and did not discuss the functional impact of Claimant's fibromyalgia, separately and in combination with Claimant's other impairments, on her

ability to perform basic work activities. It is entirely unclear from the written decision whether the ALJ considered Claimant's fibromyalgia at any step of the sequential process.

Social Security Ruling 12-2p provides guidance on the evidence required "to establish that a person has a medically determinable impairment of fibromyalgia" and how to evaluate the limiting effects of the impairment. SSR 12-2p, 2012 WL 3104869, at *5 (S.S.A. 2012). SSR 12-2p explains that fibromyalgia is "a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months." *Id.* at *2. To establish the medically determinable impairment of fibromyalgia, a claimant must produce a physician diagnosis of fibromyalgia that is adequately supported by medical findings and is not inconsistent with other evidence in the record. *Id.* Relying upon publications of the American College of Rheumatology, the SSA outlined two sets of criteria for diagnosing fibromyalgia, either of which would support a physician's opinion that the impairment was present. Essential to both sets of criteria are (1) findings of widespread pain, "that is, pain in all quadrants of the body (the right and left sides of the body, both above and below the waist) and axial skeletal pain (the cervical spine, anterior chest, thoracic spine, or low back)—that has persisted (or that persisted) for at least three months," and (2) evidence that other disorders that could cause the symptoms and signs had been excluded. *Id.* at *2-3. Once fibromyalgia has been established as a medically determinable impairment, the Ruling provides that the SSA will "follow the two-step process set forth in [the] regulations and in SSR 96-7p" to determine the claimant's resulting functional limitations. *Id.* at *5. Consequently, while SSR 12-2p does not require the ALJ to follow any different or special process in assessing a claimant's symptoms of fibromyalgia, the Ruling expressly mandates that the ALJ must evaluate the effects of fibromyalgia.

Here, the ALJ initially erred at the first step of the process by failing to evaluate Claimant's allegation of fibromyalgia and decide whether it was a medically determinable impairment. Although the ALJ stated that Claimant "has fibromyalgia," the statement appears in a paragraph concerning Claimant's alleged symptoms and conditions. Given Claimant's diagnosis of fibromyalgia and her years of treatment by a rheumatologist, the ALJ should have made a threshold finding regarding whether Claimant had a medically determinable impairment of fibromyalgia. *Ramsey v. Colvin*, No. 1:13CV553, 2015 WL 6828119, at *5–6 (M.D.N.C. Nov. 6, 2015) ("[T]he ALJ erred by failing to find Plaintiff's fibromyalgia a medically determinable impairment."). Once the impairment was established, the ALJ was obligated to rate its severity. The ALJ's failure to expressly address and rate the severity of Claimant's fibromyalgia cannot possibly be viewed as harmless given that the Court is unable to determine whether the ALJ properly considered the functional impact of Claimant's fibromyalgia at the subsequent steps of the sequential evaluation. *Waugh v. Astrue*, No. 1:11CV284, 2012 WL 6754917, at *4 (W.D.N.C. Nov. 27, 2012), *report and recommendation adopted,* No. 1:11-CV-00284-MR-DLH, 2013 WL 23991 (W.D.N.C. Jan. 2, 2013) (collecting cases) (Some courts have considered an error at step two to be harmless where the ALJ discusses and considers all of the impairments at later steps).

In *Radford v. Colvin,* 734 F.3d 288 (4th Cir. 2013), the Fourth Circuit emphasized that "[a] necessary predicate to engaging in substantial review is a record of the basis for the ALJ's ruling." *Id.* at 295 (citing *Gordon v. Schweiker,* 725 F.2d 231, 235 (4th Cir. 1984)). Without an adequate discussion, the reviewing court has no way of evaluating the basis for the ALJ's decision or determining whether it is supported by substantial evidence. *Id.* "Just as it is not [the Court's] province to 'reweigh conflicting evidence, make

26

credibility determinations, or substitute [its] judgment for that of the [ALJ],' it is also not [the Court's] province ... to engage in these exercises in the first instance.'" *Id.* at 296 (quoting *Hancock v. Astrue,* 667 F.3d 470, 472 (4th Cir. 2012)). Therefore, the undersigned **FINDS** that this case must be remanded to the Commissioner to specifically address Claimant's fibromyalgia.

## VIII.   <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **GRANT** Plaintiff's request for judgment on the pleadings, (ECF No. 9), to the extent that it requests remand of the Commissioner's decision; **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 10); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this PF&R; and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Irene C. Berger, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Berger, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** December 22, 2016

Cheryl A. Eifert
United States Magistrate Judge

28